739 A.2d 58

**MOTOR VEHICLE ADMINISTRATION**

v.

**David Walter RICHARDS, Jr.**

**No. 2, Sept. Term, 1999.**

Court of Appeals of Maryland.

Oct. 14, 1999.

Andrew H. Baida, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief, Baltimore; Leight D. Collins, Assistant Attorney General, on brief, Glen Burnie), for petitioner.

Charles M. Preston (Erin M. Danz, Stoner, Preston & Boswell, Chtd., on brief), Westminster, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

RAKER, Judge.

Following a hearing before the Motor Vehicle Administration on January 15, 1998, an Administrative Law Judge suspended the driver's license of Respondent, David Walter Richards, Jr., for a period of 120 days. Respondent's license suspension was based upon his refusal to take a chemical breath test as requested by an officer of the Maryland State Police after the officer had stopped Respondent while driving his pickup truck in Carroll County during the early morning hours of October 24, 1997. Respondent seeks to challenge the validity of his driver's license suspension through constitutional scrutiny of the officer's initial stop. Our task is to determine whether such a challenge is legally viable. More specifically, we must decide in this appeal whether the exclusionary

rule of the Fourth Amendment applies in a civil administrative driver's license suspension proceeding conducted pursuant to § 16–205.1(f) of the Transportation Article of the Maryland Code. We shall hold that the rule does not apply and shall therefore reverse the judgment rendered by the Circuit Court for Carroll County in the present case.

## I.

Shortly after midnight on October 24, 1997, Trooper F.W. Quisay, Jr. of the Maryland State Police was driving through Carroll County on the northern edge of the town of Westminster.[1] As he was patrolling the area and traveling north, the trooper "looked up on Naugahyde Drive and ... observed a vehicle's tail lights either stopped or close to stopping in the middle of the road right there towards the end of the road." Aware that "Carroll County ha[d] been experiencing a rash of vehicle thefts and night time burglaries ... in the area of Westminster and north of Westminster," and noting that there were no houses in the vicinity where the vehicle had slowed or stopped, Trooper Quisay "decided to turn around and check the vehicle to see where [the driver] might be going and see if he was going into one of the houses [on the street]." Trooper Quisay followed the vehicle, a dark green pickup truck with a "dealer tag," onto Naugahyde Drive. Knowing this road to be a dead end street, the officer surmised that the driver "either lived there or he had no real business there." The pickup truck "went all the way to the dead end of Naugahyde Drive, turned around and came back out ... without stopping at any of the houses." Thereupon Trooper Quisay stopped the vehicle: because it was "12:30 in the morning I just felt that was a little odd so I decided to stop the car and check on the driver and see what business he may have had in the neighborhood."

When Trooper Quisay spoke to the driver, later identified as Respondent, he immediately "detected a strong odor of an

---

1. The facts pertinent to this appeal have been gleaned from the undisputed testimonial evidence presented at Respondent's license suspension hearing.

alcoholic beverage." Trooper Quisay asked Respondent to step out of the pickup truck and proceeded to administer field sobriety tests. Based on Respondent's performance on the tests, Trooper Quisay arrested him and took him to the police barracks. At the barracks, Respondent refused Trooper Quisay's request to take a chemical breath test for blood-alcohol content. Upon Respondent's refusal, the trooper issued an order suspending Richards's driver's license pursuant to this State's "administrative *per se*" statute, codified under Maryland Code (1977, 1999 Repl.Vol., 1999 Supp.) § 16–205.1 of the Transportation Article.[2]

Pursuant to § 16–205.1(f), Respondent requested a hearing to determine whether his driver's license was properly suspended. The Administrative Law Judge (hereinafter "the ALJ") concluded that Respondent's license was suspended properly as a result of his refusal to take the chemical breath test requested by Trooper Quisay: the trooper had reasonable grounds to believe that the Respondent was driving while intoxicated based upon the odor of alcohol and Respondent's poor performance of the field sobriety tests. As to the propriety of the initial stop, the ALJ stated that he had no jurisdiction over the legality of the stop other than to determine whether the stop was made in good faith, which he found to be true in Respondent's case. In that regard, the ALJ stated:

> The stop itself was a good faith stop. It doesn't matter whether the stop was made because of suspicion of drinking or not. What matters is that the stop be made just as a good faith stop, in other words, that people aren't stopped just because they're a different color or whatever or that there's some kind of personal animosity or whatever. In this case it's clear that the officer had grounds to believe that there was suspicious activity based on what was going on so he had a grounds to stop the car. Once he did stop

---

2.  Unless otherwise indicated, all subsequent statutory references shall be to Maryland Code (1977, 1999 Repl.Vol., 1999 Supp.) Transportation Article.

the car, then the question becomes did he have a reasonable basis to believe that Mr. Richards had been driving while intoxicated. He notes a moderate odor of alcohol on his breath. He gave him field sobriety tests, which he failed, all of which mean that the officer's process was correct....

The ALJ ordered Respondent's license suspended for 120 days for refusing to take a breath test when properly requested to do so.

On judicial review of the administrative proceeding, the circuit court reversed the judgment of the ALJ and held that the suspension of Respondent's license was improper because Trooper Quisay did not have any justification to stop Respondent's vehicle. In announcing its decision, the court stated:

. Well, I guess good faith is equating to articulable suspicion or maybe something less than articulable suspicion, but there is a constitutional right to not be capriciously or arbitrarily pulled over by any police officer and questioned about anything, and there's a freedom of movement, ... a citizen has a right to be on the public streets....

\* \* \* \* \* \*

... [E]ven though perhaps the Administrative Law Judge does not feel he can consider the legality of the stop, I think somewhere the constitution has to come into play and to follow his reasoning, as I say, any officer could stop any other officer, and we have very restrictive procedural matters, particularly when it comes to things like roadblocks and stopping all the people that come down the road.

So I think, on those grounds, there was absolutely no right of Trooper Quisay, at that point. He followed this vehicle far enough that he could have developed any—any articulable suspicion that there was someone driving under the influence of alcohol.... So, although we don't get into the legality of the stop too often, I think this is pretty blatant. I don't think there was any justification for the stop of the person in the first place and, of course, anything after that, I think, would not be chargeable to the Defen-

dant. So, I'm gonna reverse the ... Administrative Law Judge.

The Motor Vehicle Administration (hereinafter "the MVA" or "the State") petitioned this Court for a writ of certiorari to review the circuit court's ruling. We granted certiorari to consider whether the exclusionary rule of the Fourth Amendment (1) applies in the civil administrative driver's license suspension proceeding provided for under § 16–205.1(f) and (2) thus bars introduction of evidence based on a purportedly unlawful motor vehicle stop, when an administrative law judge has found that the officer conducting the stop had a good faith basis for taking that action.

As the petitioner in this case, the MVA argues that the license suspension proceeding under § 16–205.1(f) does not fall within any exception to the general rule that the exclusionary rule of the Fourth Amendment does not apply to civil proceedings. The MVA further contends that the marginal benefits of applying the exclusionary rule to this proceeding are far outweighed by the substantial social costs its application would impose.

Respondent counters that regardless of legislative enactments or administrative rule-making, the exclusionary rule applies to "refusal hearings" under § 16–205.1 because of the nature and purpose of those hearings:

> Since the refusal to take the test is the crux of the refusal hearing, is inadmissible in the criminal proceeding [3] and clearly does not provide any evidence of intoxication *vel non*, the administrative sanction is clearly punitive. As a

---

3. Respondent does not cite any authority for the proposition that the refusal to submit to a test is inadmissible in a related criminal proceeding, independent of the exclusionary rule of the Fourth Amendment which he seeks to have applied in the present case. Quite the contrary, Maryland statutory law states, "The fact of refusal to submit is *admissible* in evidence at the trial." Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 10-309(a)(2) of the Courts & Judicial Proceedings Article (emphasis added). It is true, however, that "[n]o inference or presumption concerning either guilt or innocence arises because of refusal to submit." *Id.*

purely punitive measure, the refusal hearing is more in the nature of a quasi-criminal proceeding such as in *One 1995 Corvette* . . . .

Respondent's Brief at 7. The case to which Respondent refers, *One 1995 Corvette v. Baltimore*, 353 Md. 114, 724 A.2d 680 (1999), is a recent decision by this Court in which we held the exclusionary rule of the Fourth Amendment applicable in civil *in rem* forfeiture proceedings. *See also One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

## II.

Central to this case are the purpose, legal effect and constitutional ramifications of Maryland's "implied consent, administrative *per se* " motor vehicle law, codified as § 16–205.1 of the Transportation Article. In 1988, the General Assembly established a Task Force on Drunk and Drugged Driving "because 'the problem of drunk and drugged driving is of continuing concern to the citizens of the State of Maryland.'" *Motor Vehicle Admin. v. Gaddy*, 335 Md. 342, 347, 643 A.2d 442, 444 (1994) (quoting Joint Resolution No. 15 of the Acts of 1988). As we reiterated last year,

Among the several matters studied by that task force were (1) an *administrative per se* law, making both the refusal to take an alcohol test and the taking of such a test that revealed 0.10 or greater alcohol concentration an administrative offense that would lead to the rapid *and mandated* suspension of the offender's driver's license, and (2) a *criminal per se* law, that would make driving with an alcohol concentration of 0.10 or more a *per se* criminal offense. *See* TASK FORCE ON DRUNK AND DRUGGED DRIVING MINUTES, September 13, 1988, September 27, 1988, October 13, 1988.

*Janes v. State*, 350 Md. 284, 304, 711 A.2d 1319, 1329 (1998).

The Task Force issued a report during the 1988 legislative interim which "addressed the possibility of establishing an administrative per se law to provide immediate suspension of a

driver's license of a person detained by police on the suspicion of driving or attempting to drive while intoxicated or under the influence." Senate Judicial Proceedings Committee, Bill Analysis for Senate Bill 398, at 3 (1989). During the 1989 legislative session, the General Assembly acted upon the Task Force's recommendation and enacted an implied consent, administrative *per se* statute.[4] The first two subsections of the statute establish that (1) by driving on a Maryland public roadway a person impliedly consents to taking a test to determine breath or blood alcohol concentration if reasonably requested to do so and (2) although a motorist may refuse to take such a test, such a refusal entails a suspension of the license to drive.[5] Specifically, those subsections provide as follows:

### § 16–205.1.   Suspension or disqualification for refusal to submit to chemical tests for intoxication.

(a) *Definitions; implied consent to chemical test.—*

\* \* \* \* \* \*

(2) Any person who drives or attempts to drive a motor vehicle on a highway or on any private property that is used by the public in general in this State is deemed to have

---

**4.** *See* Laws of Maryland, 1989, Ch. 284, at 2331 (enacting House Bill 556 with changes); *see also* Laws of Maryland, 1990, Ch. 11 at 281 (enacting Senate Bill 398 with changes). Prior to its amendment in 1989, § 16–205.1 already contained an "implied consent" provision. *See* Maryland Code (1977, 1987 Repl.Vol., 1988 Supp.) § 16–205.1(a) of the Transportation Article. Indeed, by this time, all fifty states and the District of Columbia had enacted implied consent statutes. *See* Note, *Constitutional Law—Implied Consent Laws: Fourth Amendment Plus Protection for the Drunk Driver*, 19 Cumb. L.Rev. 177, 177 and n. 3 (1988–89). Moreover, as of July, 1988, twenty-three States and the District of Columbia had enacted administrative *per se* statutes. General Assembly of Maryland Report of the Task Force on Drunk and Drugged Driving 1988 Interim, at 12. *See Janes v. State*, 350 Md. 284, 306, 711 A.2d 1319, 1329–30 (1998).

**5.** Reproduction or synopsis herein of text from § 16–205.1 reflects the statute's current form. Any differences between the current form and the form of the statute as amended in 1989 are either stylistic or, though substantive, unimportant for purposes of our present inquiry.

consented, subject to the provisions of §§ 10–302 through 10–309, inclusive, of the Courts and Judicial Proceedings Article, to take a [breath or blood specimen] test [to determine alcohol concentration] if the person should be detained on suspicion of driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16–813 of this title.

(b) *No compulsion to take chemical test; consequences of refusal.*—(1) Except as provided in subsection (c) of this section, a person may not be compelled to take a test. However, the detaining officer shall advise the person that, on receipt of a sworn statement from the officer that the person was so charged and refused to take a test, or was tested and the result indicated an alcohol concentration of 0.10 or more, the Administration shall:

(i) In the case of a person licensed under this title:

\*　　\*　　\*　　\*　　\*　　\*

2. For a test refusal:

A. For a first offense, suspend the driver's license for 120 days; or

B. For a second or subsequent offense, suspend the driver's license for 1 year....

The portion of the statute immediately succeeding those above provides that "if a police officer stops or detains any person who the police officer has reasonable grounds to believe is or has been" driving or attempting to drive while impaired by alcohol and/or drugs, "the police officer shall ... [d]etain the person; ... [r]equest that the person permit a test to be taken; and ... [a]dvise the person of the administrative sanctions that shall be imposed for refusal to take the test ...." § 16–205.1(b)(2). The statute then designates that if a motorist licensed to drive in Maryland refuses to submit to the requested test, the officer is obligated, *inter alia,* to

confiscate the Maryland driver's license, serve an order of suspension, issue a temporary 45-day license, and advise the motorist of the right to request an administrative hearing to review the propriety of the license suspension. *See* § 16-205.1(b)(3). The prerequisites and scope of such a hearing are specified by subsection (f), as follows:

(f) *Notice and hearing on refusal to take test; suspension of license or privilege to drive; disqualification from driving commercial vehicles.* —(1) Subject to the provisions of this subsection, at the time of, or within 30 days from the date of, the issuance of an order of suspension, a person may submit a written request for a hearing before an officer of the Administration if:

(i) The person is arrested for driving or attempting to drive a motor vehicle while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16-813 of this title; and

(ii) 1. There is an alcohol concentration of 0.10 or more at the time of testing; or

2. The person refused to take a test.

\*    \*    \*    \*    \*    \*

(7) (i) At a hearing under this section, the person has the rights described in § 12-206 of this article, but at the hearing the only issues shall be:

1. Whether the police officer who stops or detains a person had reasonable grounds to believe the person was driving or attempting to drive while intoxicated, while under the influence of alcohol, while so far under the influence of any drug, any combination of drugs, or a combination of one or more drugs and alcohol that the person could not drive a vehicle safely, while under the influence of a controlled dangerous substance, in violation of an alcohol restriction, or in violation of § 16-813 of this title;

2. Whether there was evidence of the use by the person of alcohol, any drug, any combination of drugs, a combination of one or more drugs and alcohol, or a controlled dangerous substance;

3. Whether the police officer requested a test after the person was fully advised of the administrative sanctions that shall be imposed, including the fact that a person who refuses to take the test is ineligible for modification of a suspension or issuance of a restrictive license under subsection (n)(1) and (2) of this section;

4. Whether the person refused to take the test;

5. Whether the person drove or attempted to drive a motor vehicle while having an alcohol concentration of 0.10 or more at the time of testing; or

6. If the hearing involves disqualification of a commercial driver's license, whether the person was operating a commercial motor vehicle.

At the conclusion of the hearing, the MVA is required to suspend the Maryland driver's license of the motorist for 120 days for a first offense if it has been shown that the investigating officer complied with the mandates and duties under the statute, there was use by the motorist of alcohol and/or drugs, and the motorist refused to submit to the properly requested test. *See* § 16–205.1(f)(8).[6]

As we explained in *Janes,* the General Assembly made a deliberate effort in drafting § 16–205.1 to keep the criminal and administrative proceedings resulting from a suspected drunk-driving incident wholly separate. *See id.,* 350 Md. at

---

**6.** The General Assembly has since granted the MVA the authority to modify a suspension or issue a restrictive license to a licensee who refused to take a test, provided the licensee "participates in the Ignition Interlock System Program established under § 16–404.1 of this title for at least 1 year." § 16–205.1(n)(4); *see* Laws Of Maryland, 1998, Ch. 526. Such a resolution, however, was not yet available for Respondent's case. Indeed, the ALJ in the present case noted that he was without discretion at the time but to impose a license suspension of 120 days upon a driver who refused to take the chemical breath test if properly requested to do so.

304, 711 A.2d at 1328.   Moreover, subsection (f)(7) makes paramountly clear that the constitutionality of the stop giving rise to the test request is not one of the issues to be presented at the hearing, nor is the possible exclusion of unconstitutionally seized evidence.[7]   Accordingly, Respondent concedes that the language of the statute itself gives him no relief in the

---

**7.** In 1989, the MVA alerted the Task Force on Drunk and Drugged Drivers as to the purposeful non-inclusion of constitutional protections for Maryland drivers with respect to license suspension hearings under § 16–205.1, either in its pre-amended form or under the proposed (and later adopted) amendment:

The current law in Maryland under TR 16–205.1 requires that the police officer who stops or detains the individual have reasonable grounds to believe the individual was driving or attempting to drive while under the influence of alcohol or drugs or both.   It does not require the police officer to have probable cause to arrest.   Nor does it require that the stop be constitutional.

\*      \*      \*      \*      \*      \*

It should also be noted that the issue of probable cause to arrest cannot be raised now in administrative hearing nor will it become an issue under the draft bill.   This is often a confusing area for lawyers and judges because in criminal prosecutions the defense may move to suppress evidence obtained by police officers if they did not have probable cause to arrest the driver, which sometimes involves an examination of whether the officers had a constitutional right to stop the car.

\*      \*      \*      \*      \*      \*

The draft bill is no different from present law in properly excluding from consideration at an administrative suspension hearing whether a police officer had probable cause to arrest the motorist at the time of the stop or detention.   Whether there was probable cause to arrest may be a factor to be considered in the criminal trial, but it has no relevance in an Administration suspension hearing.   Even if it were later determined that the officer did not have probable cause to arrest, this would not negate an administrative finding that the officer had reasonable grounds to stop or detain the licensee and request a chemical test for intoxication.

Revised Memorandum from Ann E. Singleton, Assistant Attorney General, to Peter J. Cobb, Governor's Task Force on Drunk and Drugged Drivers, Legal Implications of Administrative Per Se Provisions, March 2, 1989.

The COMAR provisions implementing the enacted statute, however, provide that evidence seized or obtained in violation of a licensee's Fourth Amendment constitutional rights is admissible in a subsequent license suspension proceeding "unless the ... [p]olice officer, in obtaining or seizing the evidence, acted in bad faith and not as a reasonable officer   should   act   in   similar   circumstances...."   COMAR 11.11.02.10(H)(1).

present matter. Rather, the core thrust of his appeal is an attack upon the ALJ's interpretation and application of the statute as not affording exclusion, under the Fourth Amendment, of his refusal to take the test from the evidence presented at his license suspension hearing. Fleshed out more fully, Respondent's central contention is that whereas the officer's reasons for requesting the test that he refused to take resulted from a constitutionally invalid stop, those reasons should not be available to demonstrate that the officer had "reasonable grounds" to believe a test was called for.

### III.

The United States Supreme Court just over a year ago revisited the possibility of extending the operation of the exclusionary rule of the Fourth Amendment beyond the criminal trial context and, once again, declined to do so. *See Pennsylvania Bd. of Probation v. Scott,* 524 U.S. 357, ——, 118 S.Ct. 2014, 2020, 141 L.Ed.2d 344 (1998). The majority summarized the Court's historical approach to the applicability of the exclusionary rule as follows:

> We have emphasized repeatedly that the State's use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution. See, *e.g., United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411–3412, 82 L.Ed.2d 677 (1984); *Stone v. Powell,* 428 U.S. 465, 482, 486, 96 S.Ct. 3037, 3046–3047, 3048–3049, 49 L.Ed.2d 1067 (1976). Rather, a Fourth Amendment violation is " 'fully accomplished' " by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can " 'cure the invasion of the defendant's rights which he has already suffered.' " *United States v. Leon, supra,* at 906, 104 S.Ct., at 3412 (quoting *Stone v. Powell, supra,* at 540, 96 S.Ct., at 3074 (White, J., dissenting)). The exclusionary rule is instead a judicially created means of deterring illegal searches and seizures. *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). As such, the rule does not "proscribe the introduction of illegally seized evidence in all proceedings or

against all persons," *Stone v. Powell, supra,* at 486, 96 S.Ct., at 3049, but applies only in contexts "where its remedial objectives are thought most efficaciously served," *United States v. Calandra, supra,* at 348, 94 S.Ct., at 620; see also *United States v. Janis,* 428 U.S. 433, 454, 96 S.Ct. 3021, 3032, 49 L.Ed.2d 1046 (1976) ("If ... the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted"). Moreover, because the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its "substantial social costs." *United States v. Leon,* 468 U.S., at 907, 104 S.Ct., at 3412.

Recognizing these costs, we have repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials. *Id.,* at 909, 104 S.Ct., at 3413; *United States v. Janis, supra,* at 447, 96 S.Ct., at 3028–3029. *Id.* at ——, 118 S.Ct. at 2019. Prior to *Scott,* the proceedings outside a criminal trial to which the Supreme Court had refused to extend the exclusionary rule of the Fourth Amendment included grand jury proceedings, *see Calandra,* 414 U.S. 338, 94 S.Ct. 613; federal civil tax proceedings, *see Janis,* 428 U.S. 433, 96 S.Ct. 3021; and civil deportation proceedings, *see I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). It thus remains true in the wake of *Scott* that "[i]n the complex and turbulent history of the [exclusionary] rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." *Janis,* 428 U.S. at 447, 96 S.Ct. at 3029.[8] In each case in which the Supreme

---

8. In a footnote appended to this declaration, the Court distinguished its holding in *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), citing the criminal law aspects of the forfeiture proceeding involved therein. *See United States v. Janis,* 428 U.S. 433, 447 n. 17, 96 S.Ct. 3021, 3029 n. 17, 49 L.Ed.2d 1046 (1976). Moreover, the Supreme Court has made clear that the exclusionary rule of the Fourth Amendment does not have all-encompassing effect even in the context of a criminal trial. *See Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v.*

Court has considered so extending this remedy, "the Court determined that the potential benefit of applying the exclusionary rule was outweighed by the resulting cost to societal interests." *Riche v. Director of Revenue*, 987 S.W.2d 331, 334 (Mo.1999) (en banc).

This Court has also been called upon several times to determine the applicability of the exclusionary rule of the Fourth Amendment to civil proceedings in various contexts. In only one case have we held the exclusionary rule applicable to a proceeding other than a criminal trial. *See One 1995 Corvette v. Baltimore*, 353 Md. 114, 724 A.2d 680 (1999) (following Supreme Court's holding in *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) and ruling exclusionary rule of Fourth Amendment applicable in civil *in rem* forfeiture proceedings, in part because of their "quasi-criminal" nature). In all other relevant cases we have rejected any extension of the rule to civil proceedings. *See Sheetz v. City of Baltimore*, 315 Md. 208, 553 A.2d 1281 (1989) (holding exclusionary rule generally inapplicable in context of administrative employment discharge proceedings); *Chase v. State*, 309 Md. 224, 522 A.2d 1348 (1987) (holding as general rule that in revocation of probation proceedings, exclusionary rule does not apply to bar evidence illegally seized by police from probationer);[9] *Chu v. Anne Arundel County*, 311 Md. 673, 537 A.2d 250 (1988) (in construing Maryland Code Article 27, § 551, concluding that federal exclusionary rule not applicable to civil proceedings for return of seized property); *Whitaker v. Prince George's County*, 307 Md. 368, 514 A.2d 4 (1986) (generally rejecting application of exclusionary rule in public nuisance actions).

---

*Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *Cf. Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

**9.** Our decision in *Chase v. State*, 309 Md. 224, 522 A.2d 1348 (1987), was validated little more than a decade later by the United States Supreme Court's similar holding in *Pennsylvania Bd. of Probation v. Scott*, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998).

We emphasized in *Whitaker* that although the Supreme Court's ruling in *Janis* "cannot be said to stand for the proposition that evidence may *never* be excluded in a civil proceeding, it nonetheless severely undermined those cases in lower courts which applied the exclusionary rule to civil proceedings." *Id.* at 382, 514 A.2d at 11 (citation and footnote omitted). Furthermore, the Supreme Court has unequivocally "established that the 'prime purpose' of the rule, if not the sole one, 'is to deter future unlawful police conduct.'" *Janis*, 428 U.S. at 446, 96 S.Ct. at 3028 (quoting *Calandra*, 414 U.S. at 347, 94 S.Ct. at 619); *Whitaker*, 307 Md. at 381, 514 A.2d at 11.

We have noted the marginal deterrent effect and the substantial costs of applying the exclusionary rule of the Fourth Amendment beyond the context of criminal or quasi-criminal proceedings. For example, in rejecting the application of the rule in public nuisance proceedings, we noted that "[a] detective who might be tempted to obtain evidence illegally for use in a criminal case may not even consider the effect of such illegality upon a proceeding to abate a public nuisance." *Id.* at 383, 514 A.2d at 12. We have also expressed concern with the effect of applying the exclusionary rule in streamlined administrative proceedings. *See Sheetz*, 315 Md. at 215 n. 8, 553 A.2d at 1284 n. 8 ("'On the cost side there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs.'" (quoting *Lopez–Mendoza*, 468 U.S. at 1041, 104 S.Ct. at 3485)).

## IV.

Given the general background of the exclusionary rule of the Fourth Amendment and the substantial body of precedent under both the Supreme Court and this Court generally refusing to extend its operation beyond the context of a criminal trial, we shall now proceed to determine whether the rule should be applied as a matter of principle to hearings conducted pursuant to § 16–205.1(f). In light of that precedent, we shall focus on whether the benefits of applying the

exclusionary rule to administrative license suspension hearings outweigh the costs of such.

At the outset, we reject the notion that an administrative license suspension proceeding under § 16–205.1(f) requires the application of the exclusionary rule of the Fourth Amendment because such a proceeding is "quasi-criminal" in nature. Respondent has taken great pains to distinguish the administrative proceeding in the present case, a "refusal" hearing, from a hearing under the same statute with respect to a person who took the chemical breath test and "failed" (by registering a blood-alcohol content of .10 percent or higher) as well as from other purely civil proceedings. Along these lines, Respondent asserts the refusal hearing to be "purely punitive" and "quasi-criminal" in nature, therefore analogizing it to the civil *in rem* forfeiture proceeding, to which we recently held the exclusionary rule of the Fourth Amendment applicable. *See One 1995 Corvette v. Baltimore,* 353 Md. 114, 724 A.2d 680 (1999).

Writing for the Court in *1995 Corvette,* Judge Cathell stated that "the *Fourth Amendment* applies to *all* 'unreasonable searches and seizures' by the government, regardless of context." *Id.* at 129, 724 A.2d at 688 (citation omitted) (first emphasis added). On the other hand, as Judge Cathell prefaced, the *exclusionary rule* of that Amendment "is a judicially-created remedy intended to apply primarily to criminal and 'quasi-criminal' proceedings." *Id.,* 724 A.2d at 688. Moreover, in labeling the forfeiture proceeding in *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), "quasi-criminal," the Supreme Court explained that the object of a forfeiture proceeding, "like a criminal proceeding, is to penalize for the commission of an offense against the law." *Id.* at 700, 85 S.Ct. at 1250 (quoted in *1995 Corvette,* 353 Md. at 121, 724 A.2d at 683).

We disagree with Respondent's characterization of § 16–205.1 as "quasi-criminal." This Court has on several occasions addressed the purposes behind this State's legislation against "drunken driving." It is true that "[t]he General Assembly's goal in enacting the drunk driving laws ... is 'to meet the considerable challenge created by this problem by enacting a

series of measures to rid our highways of the drunk driver menace. These measures ... are primarily designed to enhance the ability of prosecutors to deal effectively with the drunk driver problem.'" *Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 464, 597 A.2d 939, 944 (1991) (quoting *Willis v. State,* 302 Md. 363, 369–70, 488 A.2d 171, 175 (1985)). Nevertheless, as we emphasized in *Shrader,* § 16–205.1 and related statutory provisions "were enacted for the protection of the public and not primarily for the protection of the accused." *Id.* at 464, 597 A.2d at 943 (citations omitted).

This Court has also previously found "that license suspensions generally serve remedial purposes," a conclusion "drawn from the purposes served by licensing systems themselves, *i.e.* to protect the public from unscrupulous or unskilled operators who would otherwise engage in the licensed activity." *State v. Jones,* 340 Md. 235, 251, 666 A.2d 128, 136 (1995) (holding that separate subjugation of motorist to criminal prosecution and administrative sanctions under § 16–205.1 does not run afoul of double jeopardy prohibition). Moreover, as we went on in *Jones* to elaborate,

> From the licensee's perspective, it is certainly true that suspension or revocation of a license may feel like 'punishment.' *A licensing system's ultimate goal, however, is to prevent unscrupulous or incompetent persons from engaging in the licensed activity.* To this end, revocation or suspension of a license clearly prevents a wrongdoer from further engaging in the licensed activity, at least temporarily.

*Id.* at 252, 666 A.2d at 136 (footnote omitted) (emphasis added). The Supreme Court made similar observations while reviewing Massachusetts's implied consent, administrative *per se* statute in 1979. Albeit expressed in the context of reviewing that statute for comportment with the requirements of due process, those observations are nonetheless appropriate here:

> The Commonwealth's interest in public safety is substantially served by the summary suspension of those who refuse in several ways to take a breath-analysis test upon arrest. First, the very existence of the summary sanction

of the statute serves as a deterrent to drunken driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways.

The summary and automatic character of the suspension sanction available under the statute is critical to attainment of these objectives.

*Mackey v. Montrym,* 443 U.S. 1, 18, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 321 (1979).

Given the similarly multi-purposed nature of the sanctions in § 16–205.1, we do not view the statute as quasi-criminal. *See Powell v. Secretary of State,* 614 A.2d 1303, 1307 (Me.1992) (concluding that "a license suspension hearing is not a quasi-criminal proceeding"). Nor do we see any principled reason to differentiate for our present inquiry a license suspension hearing under § 16–205.1(f)(1)(ii)(1)—for test failures—from one under § 16–205.1(f)(1)(ii)(2)—for test refusals. Though prompted by distinct occurrences, the two hearings are both remedial in nature: their primary goals are first, to help effectuate the administrative goals of the MVA in ridding Maryland roadways of drunk drivers and, second, to encourage both general compliance with Maryland law as well as specific fulfillment of the consent to taking a properly requested chemical breath test implied by a motorist's entry upon and usage of this State's roads.

With respect to the benefit of applying the exclusionary rule of the Fourth Amendment in a § 16–205.1(f) hearing, whether the case involves test failure or test refusal, we do not view any possible deterrent effect to be sufficiently significant. In either case, there would likely be only scant marginal deterrence because the police already suffer the exclusion of unlawfully seized evidence from criminal proceedings.[10] *See Penn-*

---

**10.** Despite Respondent's flawed assertion that "the refusal to take the test ... is inadmissible in the criminal proceeding" independent of the

*sylvania Bd. of Probation v. Scott,* 524 U.S. 357, ——, 118 S.Ct. 2014, 2020, 141 L.Ed.2d 344 (1998); *United States v. Janis,* 428 U.S. 433, 448, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976); *United States v. Calandra,* 414 U.S. 338, 351, 94 S.Ct. 613, 621, 38 L.Ed.2d 561 (1974). Furthermore, because the MVA is a separate and independent agency from the police department and has no control over the actions of police officers, imposing the exclusionary rule in license suspension proceedings would add little force to the deterrence of unlawful police action. *See Riche v. Director of Revenue,* 987 S.W.2d 331, 335 (Mo.1999) (en banc); *Westendorf v. Iowa Dept. of Transp.,* 400 N.W.2d 553, 557 (Iowa 1987). We find as a general matter that the administrative mechanisms and proceedings relative to license suspension or revocation fall "outside the offending officer's zone of primary interest." *Janis,* 428 U.S. at 458, 96 S.Ct. at 3034; *see also Scott,* 524 U.S. at ——, 118 S.Ct. at 2022. There is scarce reason to believe that police would be motivated to seize evidence illegally simply to use it in license suspension proceedings. *See Scott,* 524 U.S. at ——, 118 S.Ct. at 2022 (commenting that "the officer's focus is not upon ensuring compliance with parole conditions or obtaining evidence for introduction at administrative proceedings, but upon obtaining convictions of those who commit crimes."). *See also Sheetz v. City of Baltimore,* 315 Md. 208, 215, 553 A.2d 1281, 1284 (1989) ("Because their primary interest is not typically in [employment] discharge proceedings, the police are not especially tempted to violate the fourth amendment in order to obtain evidence for such proceedings. Therefore, in this context, the exclusionary rule, designed to deter such violations, is not particularly useful." (footnote omitted)); *Com., Dept. of Transp. v. Wysocki,* 517 Pa. 175, 535 A.2d 77, 79 (1987) (stating that basis for employing Fourth Amendment exclusionary rule is to deter police officials from engaging in

---

exclusionary rule of the Fourth Amendment, *see supra* note 3, it cannot be denied that even in the case of a test refusal, other valuable evidence could be excluded from a criminal trial if the officer's detention of the motorist was constitutionally invalid and the issue is properly raised.

improper conduct for purpose of obtaining criminal convictions). *Cf. 1995 Corvette,* 353 Md. at 138, 724 A.2d at 692, (with respect to law enforcement forfeitures, noting that "governments increasingly have filed civil forfeiture actions in lieu of criminal charges, knowing that constitutional protections provide greater obstacles to their criminal cases, and that forfeitures have a great financial impact not only on the defendant but on the government's coffers as well"). Finally, as we have stated in the past, police officers still will be deterred from violating drivers' constitutional rights despite the non-exclusion of evidence in administrative license proceedings because they are subject to other penalties and civil liabilities for engaging in such conduct. *See Chase v. State,* 309 Md. 224, 253, 522 A.2d 1348, 1362 (1987).

In contrast to the limited deterrent value, the costs of applying the exclusionary rule of the Fourth Amendment in hearings under § 16–205.1(f) are great. The underlying purpose of administrative license suspensions, the protection of the public, would be undermined. *See Powell,* 614 A.2d at 1307. Whereas the General Assembly has given high priority to the enforcement of drunk driving laws and its expected increase in the safety of Maryland's roadways, *see generally* Department of Legislative Reference, Bill Files for Senate Bill 398 and House Bill 556 (1989), we agree with the conclusion of the Supreme Judicial Court of Maine that

the application of fourth amendment principles would add an undue burden to license suspension hearings.... [A] license suspension hearing is not a quasi-criminal proceeding, but rather a "reasonable regulatory measure to protect public safety." Requiring hearing examiners to apply the exclusionary rule would unnecessarily complicate and burden an administrative proceeding designed to focus on the single issue of whether a person was operating a vehicle with excessive alcohol in his blood.

*Powell,* 614 A.2d at 1307.

In *Janes v. State,* 350 Md. 284, 301, 711 A.2d 1319, 1327 (1998), we observed that proceedings like those under § 16–

205.1 are intended to be informal and summary in nature. *See also Riche*, 987 S.W.2d at 334 (concluding that extending the exclusionary rule to administrative license suspension hearings "would impose significant costs to society . . . [and] would unnecessarily complicate and burden an administrative process designed to remove drunken drivers from Missouri's roads and highways as quickly as possible."). Affording licensees the opportunity to invoke the exclusionary rule of the Fourth Amendment in license suspension proceedings would not only interfere with the informal and summary nature of those proceedings but also alter their purposefully limited scope, as prescribed under § 16–205.1(f)(7). *Cf. Scott*, 524 U.S. at —— – ——, 118 S.Ct. at 2020–21 (finding that application of exclusionary rule would significantly alter traditionally flexible and informal administrative procedures of parole revocation because exclusionary rule frequently requires extensive litigation that is inconsistent with nonadversarial, administrative processes); *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1048, 104 S.Ct. 3479, 3488, 82 L.Ed.2d 778 (1984) (observing that prospect of even occasional invocation of exclusionary rule might significantly change and complicate character of deportation system).

Because of the only marginal—if any—deterrent effect of excluding evidence from administrative license suspension proceedings, and in light of the nature and purpose of this State's administrative *per se* statute in general and of the license suspension hearings under § 16–205.1(f) in particular, we hold that the exclusionary rule of the Fourth Amendment should not be extended to proceedings conducted pursuant thereto.

Although we have concluded that the exclusionary rule of the Fourth Amendment is not applicable in license suspension proceedings under § 16–205.1, we are nevertheless concerned, as in *Sheetz* and *Chase*, that our decision today not be abused. We need not, however, dictate an exception to our general rule that the exclusionary rule does not apply in administrative license suspension proceedings, as we found necessary in those two cases with respect to the administrative proceedings

involved therein.[11]   The current statutory and regulatory framework for § 16–205.1 adequately addresses our similar concerns in the present matter.  As noted in the State's brief, the MVA accounted for this Court's concerns in *Sheetz* and *Chase* by promulgating COMAR 11.11.02.10H(1) with respect to § 16–205.1(f) hearings.  That regulation provides that when a police officer, in obtaining or seizing disputed evidence, acted in bad faith and not as a reasonable officer should act in similar circumstances, the evidence is inadmissible.[12]

■ In conclusion, because the exclusionary rule of the Fourth Amendment does not apply in civil administrative license proceedings under § 16–205.1(f), and because the ALJ found the initial stop to have been made in good faith, the circuit court erred in ruling that Respondent's license was not properly suspended for failing to take a chemical breath test when legitimately requested to do so.

*JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY REVERSED.  CASE REMANDED TO THAT*

---

11.  As we reiterated and applied in *Sheetz v. Mayor and City Council of Baltimore*, 315 Md. 208, 553 A.2d 1281 (1989):

> [W]e established in *Chase* [*v. State*, 309 Md. 224, 522 A.2d 1348 (1987)] an exception to the admissibility of illegally obtained evidence: "when the officer has acted in bad faith and not as a reasonable officer would and should act in similar circumstances, the evidence should, in any event, be suppressed." 309 Md. at 253, 522 A.2d at 1362.  The Court reasoned that "it would derogate due process of law to presume conclusively that in such cases the police officer acted in good faith." 309 Md. at 253, 522 A.2d at 1363.  Thus "[e]vidence concerning the officer's conduct which would be sufficient to call upon the State to rebut is credible evidence indicating *prima facie* to the satisfaction of the hearing judge that the officer's actions were not in accord with reasonable law enforcement activities but were prompted by improper motives." 309 Md. at 254, 522 A.2d at 1363.

*Id.* at 213, 553 A.2d at 1283 (third alteration in original).

12.  Respondent takes issue with the promulgation of COMAR 11.11.02.10H(1) being viewed as setting out a "good faith exception" to the application of the exclusionary rule of the Fourth Amendment in proceedings under § 16–205.1(f).  Given our determination that the exclusionary rule is *not* applicable, this COMAR provision is indeed not a "good faith exception" but rather a "bad faith" basis for exclusion of evidence of test refusal or test failure at a license suspension hearing.

*COURT WITH INSTRUCTIONS TO AFFIRM THE RUL-
ING OF THE ADMINISTRATIVE LAW JUDGE PRESID-
ING OVER RESPONDENT'S LICENSE SUSPENSION
HEARING. COSTS TO BE PAID BY RESPONDENT.*

Judge RODOWSKY concurs in the result only.